Committee of Unsecured Creditors and the OPCO Noteholders. We have allotted 20 minutes of time each. I understand, Mr. Clement, you're going to argue first, is that correct? Okay. All counsel, you should assume that we are completely familiar with the written material you've submitted and the key cases that you have cited in connection with that material. Mr. Clement, if you'd like to begin. Thank you, Your Honors, and may it please the Court. Paul Clement for the appellants. When a plan proposes giving a class everything for their claims that the law, including the bankruptcy code, entitles them to receive, the class is unimpaired and cannot vote against the plan or hold out for more than the code provides. That is true even when they're worth outside of bankruptcy. Instead, the relevant question under the plaintext of 11 U.S.C. 1124 sub 1 is not whether the code impairs the value of the claims, but whether the plan leaves the claims unimpaired. The Third Circuit adopted this common-sense rule of plan impairment 15 years ago in the PPI decision, and it has been embraced by every court to consider this issue since. PPI was an insolvent debtor, though, was it not? I believe it was, Your Honor, but I don't think the rule here on the threshold question turns on whether you have a solvent or an insolvent debtor. It makes a lot more sense to trim the creditor's claim rather than make the debtor — rather than make the creditor bear that — the debtor bear that burden. In other words, we've got $400 million sitting there, and you want to take part of it rather than have your contract enforced. Well, I understand the point of your question, Your Honor, but I think that the code of 1124.1 doesn't provide for one answer for solvent debtors and a different answer for insolvent debtors. The bankruptcy court, as you know, said that claims was different from allowed claims. I understand that, Your Honor, but I don't think the bankruptcy court purported to adopt an interpretation of 1124.1 that's limited to the solvent debtor context. I mean, the text is the text, and it applies whenever you have somebody who — so you can think about it as the difference between claims and allowed claims. I think the way most courts have thought about it is the difference between plan impairment and statutory impairment. But however you think about the dichotomy, I don't think it really — there's any basis in the text to have one rule for solvent debtor cases and a different rule for insolvent debtor cases, which are — Well, it makes some sense. I mean, the whole purpose of bankruptcy is to divide up the — when all the debts can't be paid, divide it up — divide up the debts to be equitable. Well, I would disagree to this extent. That may be sort of the main purpose of bankruptcy, but I think more broadly, the purpose of bankruptcy is to take debtors that are in a situation of financial distress, who take advantage of the bankruptcy code provisions in order, in good faith, to address that financial distress, and then they get the benefits of those rules. And that's true, even if they — you know, you can go into bankruptcy even if you're not technically insolvent. You can certainly have a situation like this, where because of changes in commodity prices, my clients were solvent at — insolvent at the point they went into bankruptcy, but afterwards, by the time the plan was proposed, they were actually solvent. Now, you — obviously, I can understand why you might have a concern in the back of your head that, well, maybe somebody could manipulate the bankruptcy code in a way that they aren't really in financial distress, and they really are just filing to get the benefit of the sort of provisions of — a number of provisions, including those in 502B. But the code addresses that in other ways. There's a doctrine that basically says that if somebody has not invoked the bankruptcy code in good faith, then you can dismiss the petition. And if you dismiss the petition, then you can no longer claim the benefit to — and put the burden on the debtor who's got — who's solvent. I don't know how much he's getting — how much he came out of the bankruptcy with, but a lot. Why isn't it more fair to make him pay the money? Well, I mean, I'll try to answer the question, you know, but I'm not sure that the bankruptcy code simply says, do what's most fair under these circumstances. I think the code provides specific answers, and I think it answers this question directly. I don't think, though — I mean, keep in mind, you're talking about people who, you know, in this circumstance, the creditors are going to get 100 cents in the dollar for everything the code allows. And they are also going to get post-petition interest. Now, we had a debate about what's the right rate for that, and I'm happy to talk about that in due course, but they are absolutely going to get post-petition interest. And so I don't think there's anything unfair about that. Or maybe to put it differently, if there's anything unfair, the source of the unfairness is the code, not the plan. It's the code, after all, that says that if you are legitimately in bankruptcy, then there are certain claims where they are reduced. They are reduced — you know, a lender doesn't get everything that the lender was going to get under the contract outside of bankruptcy. That's the PPI set of facts. Here you have a situation where the lender doesn't get everything they would have gotten outside of bankruptcy because of the operation of 502B2. You could have the same thing with, you know, having to defend lawyers who think they have a contractual right to all of their fees, but under bankruptcy they only get their reasonable fees under 502B. I'll read Collier to say that in the rare case of a solvent bankrupt, the absolute priority rule requires the application of rights as specified in the creditor's contract rather than some other disposition. Well, Your Honor, I think that would be a concept, and my friends certainly argue for the idea that there's some sort of solvent debtor exception that would operate sort of independent of the provisions of the code. We don't think there's any support in the law for that. Certainly courts have applied these provisions to solvent debtors before, and I think this is a classic situation where the code provides an answer, and I don't think that the code allows you to essentially either skip back to the, you know, the prehistoric days of the Bankruptcy Act and draw a solvent debtor principle from those cases  where that's been applied in a solvent debtor case. Where this provision has been applied in a solvent debtor case. I'll get back to you in rebuttal with my best case on that, Your Honor. I'm sorry. I don't – precisely because the text doesn't really amend itself, lend itself to that distinction, I haven't thought about it in those terms, but I'll try to get back to you with that in rebuttal. Mr. Clement, can we go back to the concept of plan impairment versus code impairment? So I'm looking here at the – this is the description of the Class IV OPCO-funded debt claims that your clients proposed to the bankruptcy court. And there's a description of the classification, and then there's a description of the allowance. And the allowance is the principal amount, and then there's the pre-petition interest, and then, as you alluded to earlier, post-petition interest. What if at the end of the allowance your clients had said, and also the make-whole amount, what would the bankruptcy judge have done with that? Obviously, I don't know for sure. I mean, I think the bankruptcy court might have said, you know, pointed out that if that's unmatured interest, there's a dispute over whether that's unmatured interest, and if it is, the plan doesn't need to provide that. I'm not sure there's, like, an absolute rule that says that the plan can't provide it, but I don't think the plan, whether the plan provides that unnecessary delta or not, comes within the meaning of impairment. That's interesting. I thought you would have said that 502B2 and its bar on unmatured interest operates as some sort of automatic prohibition against the power of the bankruptcy court to confirm such a plan. Is that not your argument? That may be true. I think our argument would be that whether or not that's true, because I'm just, I guess on my reading of 502B2, I'm not sure it addresses that in those terms, but I think that the point would be that a plan that doesn't provide for that delta leaves the claims unimpaired. So what if we get it this way? What if instead of saying you can also get the, we also allow the make-whole amount, what if it had said we also allow unmatured interest? Same answer? That they could have done it and who knows what the bankruptcy judge would have done? I think structurally it should be the same interest. And maybe just if I could offer one more possibility, they could have said and $100,000 without specifying what that extra bonus payment was for. I'm not sure, as I stand here, I know if there's something in the bankruptcy code that would prevent them from putting that in the plan, especially if all the other classes got paid what they're supposed to be paid. Maybe there's some principle that would otherwise do it. But if the plan happened to just provide a bonus payment just because they were feeling really great that morning, I don't think you would say the fact that the plan doesn't provide that in any way impaired the claims. And I think the same analysis applies to make-whole or unmatured interest or anything else. If there is something that the code doesn't require you to pay but doesn't absolutely prohibit you from paying, it may be that the plan is what's providing it, but the plan is not impairing your claim in any way by not providing that which the code doesn't require you to provide. And I think it's helpful for context for this. You know, in other cases, this case, this issue about whether the make-whole is unmatured interest was essentially deferred. But under the bankruptcy rules, that could have been one of the first issues that the parties litigated. And it could have been, let's say, hypothetically resolved by the bankruptcy code that the make-whole was unmatured interest and was not due and is not something that under 502B2 we had to provide for. Now, I was just going to say, if the court had already held that and it was now time to propose our plan, I think a plan that didn't provide that, I don't think in any way you'd say, well, the plan's impairing your claims. Of course not. But what if the plan had said at the end of, again, I'm just reading the allowance, instead of saying we provide this thing that the code may or may not provide, what if it had just said we bracket the make-whole amount and the creditors can fight about that in New York State court under New York law? And I know you have arguments about whether it's a double dip and all the rest of it. But what if the allowance had just said we carve out the make-whole amount and we're not discharging that in this plan? You could have written the plan that way, right? As I'm standing here, I don't know of anything that would have prevented us from writing the plan in those terms. But I think as long as the plan provides everything that the law entitles the class of claimholders to provide, and when I say the law in that context, I include the bankruptcy code, then I think you would conclude as a matter of law, consistently with PPI, that the plan is not what is doing the impairing. And this is the thing I'm struggling with. If you could have written the plan to say we provide you the make-whole amount, you could have written the plan to say we provide you unmatured interest, you could have written the plan to say we're just going to let you go fight about it in New York State court, and there's nothing in the bankruptcy code itself that would prohibit either writing the plan that way or a bankruptcy court from confirming the plan that way, then it really sounds like the plan is doing the work, right? It's not like the code has some sort of over-the-top legal effect on the rights of the creditors. With all due respect, I don't think that's right. I mean the plan may be doing some work, but it's not doing the work of impairment. And that is the critical thing. And if you look at the statutory text in 1124.1, it asks whether the plan leaves the claims and the rights under those claims, essentially says whether they continue to get everything to which they're entitled. Well, it says alter the legal rights of the creditor. But we might as well talk about the exact text if we're talking about text. The plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder. And so under circumstances where the plan does or does not provide something that the holder is not entitled to as a matter of law, the plan is not impairing. Now, the plan, like I said, it may be that the plan could provide a bonus payment, but if it doesn't, it is not impairing the legal rights to which the holder is entitled. So on the day before plan confirmation, so the plan's been proposed, but the day right before it's confirmed, is there a legal right to the make-all amount? I mean, the contract says the make-all amount is due and immediately payable. Would you say that there is a legal right the day before the plan is confirmed? I certainly don't think there's any. I would say no, there's not a legal right to it. And it's certainly no enforceable legal right, and you couldn't go into court in part because of the automatic stay and other things. And so you'd sort of have to wait until plan confirmation before you could do anything anyways. What if the day before plan confirmation, so the contract obviously says the make-all amount is due and payable. What if the day before plan confirmation the bankruptcy judge dismisses it under Chapter 3? Right. Then they could have gone to court and enforced that legal right. Absolutely. But the plan still wouldn't have done any impairing. So, you know, because at that point the plan sort of goes away. And I think it's worth understanding that, you know, certainly Congress when they passed this statutory provision, if where they were concerned about the action taking place was the confirmation of the plan or the discharge, I think they would have used those words. I think the reason they created this separate concept of impairment and plan impairment, I think is the correct view, is because they were really trying to have a process for ascertaining who gets to vote on the plan. And I think what they recognized is if you are getting everything to which you are entitled under the law, including the bankruptcy code, you're not in a position where you should be able to vote on the plan or hold out for a premium. Because what you'd be holding out for would be, by definition, something more than the bankruptcy code or the law otherwise allows you to have. And so I think if you sort of think about kind of where 1124 fits into the overall code, it makes even more sense that the provision is at that point something that applies to what the plan is being proposed by the debtor at that time, and it's not sort of looking forward to what might happen with confirmation or the like. Counsel, why don't you take another additional three minutes? I know we had a lot of questions, and we'll give each of your opponents an extra minute and a half to go with their presentations if you would continue. No, I appreciate that, Your Honor. And I think if you are with us on the issue of it being plan impairment and not statutory impairment, and I do think it's worth emphasizing that would mean being with the Third Circuit and basically every other court that has decided this case, then it's really a question for this court whether it wanted to go on and address the questions that the bankruptcy court did not address in the first instance because he adopted this anomalous view of statutory impairment. We think that the answers to those questions are actually quite straightforward, and we think there would be some benefit in terms of the development of the law for this court to address those issues. But obviously, you would have the option of remanding. I'm going to start with the observation that's relevant to something I said in my colloquy with Judge Davis earlier, which is neither of these next two issues really lend themselves to a completely different rule for solvent debtors. So the question about make whole payments, the question about what's the right post-petition interest rate, both of those are going to arise in solvent and insolvent debtor cases and probably arise more frequently in insolvent debtor cases. And so I think it is probably right to decide those issues without sort of an overhang from the fact that in this particular case you have a solvent debtor. As to the make whole amount, it seems to me that this court has already held that under 502b2 you're looking not just for interest but the economic equivalent of interest, and it seems to me that that describes the make whole amount to a T. If you look at what the make whole amount is, it is literally the future payments that would be made under the note backing out the principal and then discounting to present value. It seems to me that is simply interest or at least the economic equivalent of interest, and that's what the make whole amount provides. Part of the reason there's this whole double counting issue with the post-petition interest is because the make whole amount and the post-petition interest are both providing for interest. Why would they include both if it's for the same concept as you all describe in the briefs, that this is for deprivation of use of the money while it has been lent? Why would the documents provide for both the make whole amount and an accelerated interest? I think there's an excellent answer to that question, which is in the main, the make whole amount is going to apply, or certainly in lots of its applications, it's going to apply when there's actual prepayment, and when there's actual prepayment as opposed to acceleration and then nonpayment for some period of time, there's no double count. So the double counting here really has two critical ingredients that is relatively unique to this situation and is not true of other make whole payments. The typical make whole payment in this situation would calculate the make whole from the point that you actually pay off the amount. This particular make whole actually calculates the make whole payment amount, at least in cases of acceleration, at the point of the default event. And then the problem here is the default event happens, then there's 532 days in bankruptcy. The post-petition interest provides interest for the 532 days in bankruptcy, and the make whole amount provides compensation for interest from the date of bankruptcy to the end of the notes, including that first 532 days. So there's double payment for interest for those 532 days, and in the normal application of it, when somebody actually prepays, there's no double counting problem. So that's why I think it was written the way it was. You can always write a contract better. You can always write a statute better. But I think that's why the contract was written that way. Okay. All right. Thank you. Thank you, Your Honor. Mr. Willett. Good morning, Your Honors, and may it please the Court. I think, Judge Oldham, you have it right. It is the plan that does the work. And I also agree with Mr. Clement that the text is the text. I just think he's misreading the text on 1124. What is impairment by definition? It is alteration of what? A claim. Not an allowed claim. Allowed claim is a phrase that's used throughout the Code, not here. A claim is a set of state law rights. So where in the Bankruptcy Code do those get altered? They never get altered until a plan is confirmed and the power of the bankruptcy court conferred by Congress is exercised to make those state laws go away. As you said a moment ago, Judge Oldham, if the case had been dismissed, I believe my colleague admitted that they'd revert to their state law rights, which means that 502's rules are not self-activating. They don't change claims until and unless there has been confirmation and the power under 1141D. Now. Does the bankruptcy court have the discretion to dismiss the bankruptcy proceeding? They do, or a creditor or a party in interest may move for dismissal if it's unable to confirm a plan. But the idea here. No, no, in this case, though, if there had been a proper motion made, did the bankruptcy court have discretion to dismiss it? The move-on would have to show proper grounds for dismissal. I don't know if those grounds existed here unless the plan were to be construed as the appellant wishes it to be construed now. Which gets us to the point, Your Honor, of 1124. What is the purpose of this statute, this unimpairment concept? It's central to bankruptcy that creditor voting is essential to Chapter 11. Creditors negotiate, they form groups, deals are made, and they can vote for them, including the example you gave. They could have given us a make or we could have voted for it. But the debtor has an election. The debtor can exclude a creditor or a class of creditors from the process entirely. You can't vote. You won't have the power to negotiate that is conferred by voting. But in exchange, we will leave you undisturbed by this entire Chapter 11 process. That's what 1124 is about. That's why the phrase allowed claim isn't there. Let me talk about a provision of text, a different statutory provision, that uses both the power to vote and allowed claims, and that's 1126A. Yes. So it says the holder of a claim or interest allowed under Section 502. So suppose I believe that the make whole amount is disallowed under 502B2 as unmatured interest. You are the holder of an allowed claim. You get to vote, right? You may accept or reject a claim, right? But if I think that the make whole amount is disallowed under Section 502, then you don't get to vote as to the disallowance of the make whole amount. Is that right? Not quite, Your Honor. Here's how it would work. You put us in a class. You deny us the make whole in that class. That makes us impaired. We vote. Now, if we accept it because the debtor is insolvent and this is the best we're going to do, life goes on, the plan is confirmed. If we vote to reject, then you go to a cram-down hearing, and in a cram-down hearing you have to consider whether the plan is fair and equitable, which gets right back to Judge Davis's question. How can it be fair and equitable when they take $386 million owed to creditors and confer them on a solvent corporate parent? That's what would happen in the voting. And I'm just trying to understand the interaction between 1124 impairment and 1126A, which talks about voting, because if, in fact, you've been allowed everything that 502 would allow you to have, then 1126F says you're presumed to have voted in favor of plain confirmation. So that's what I'm trying to understand. This very specifically incorporates both the disallowance provisions of 502 and the power of voting, and I'm just trying to understand how those two provisions interact with each other. I believe the way that works, Your Honor, is that if you have an allowed claim, you can vote, you can reject, and it's only the holder of an allowed claim that votes. So if your claim is unimpaired, then the claim, not the allowed claim, is at issue and you're left undisturbed. I don't think 1126 contravenes that, but I'll just. . . Yeah, I don't necessarily read them to be in tension, but there's so much in your brief about the distinction between claims and allowed claims. This strikes me as an interesting provision of text that very specifically talks about both the power to vote, which I understand to be the principal argument for the no-holders, and also the concept of allowed claims under 502. Right. There's no. . . Another place to look for this, Your Honor, is right in the first sentences of 502B. What happens when someone objects to the filing of a proof of claim? It says that the court will determine the claim, claim, not allowed claim, and then will allow it except to the extent of 1, 2, 3, 4, 5. So they're teaching you right there claims are different than allowed claims. And if we had any doubt about this, we would just look at the 1994 amendment. Congress was so offended by the fairness problem that Judge Davis identified, where a solvent debtor is avoiding post-petition interest, that Congress just struck in about six months, just struck that allowed claim reference right out of the statute. Now, I know people disagree about the relevance of legislative history, but legislative history is never more powerful than when Congress is reacting by name to a specific court decision. So PPI obviously deals with that legislative history and would suggest that your argument is over-reading it. I'm sorry, Your Honor. If I may, PPI is careful to distinguish the post-petition interest situation. It says we're not addressing that here. We're making a distinction for landlord claims. People can argue whether that's a valid distinction. But my friend has to nail his colors to the mast of PPI. He's got nothing else. And PPI carves out post-petition interest. He also has colliers in every case that's ever addressed the question between plan impairment and code impairment. Is there any case that you've got that suggests that the distinction that you'd have us draw is a valid one? This is the first. But none of those cases – if I can paraphrase my colleague, footnote 8 from his reply, all those cases that you refer to have more of repetition than analysis about them. And colliers just says this is what the rule has been. None of those cases address 1141D. None of them explains what is it in 502 that could alter a claim before a plan is confirmed. Now, if I may, Your Honor, I want to come back to one of Judge Davis's questions earlier. You asked my colleague for his best case. I'll tell you what his worst case is. His worst case is the case decided by your colleagues in the Sixth Circuit in Dow Corning, where you had almost the same situation here. You had a solvent debtor acting under the bankruptcy code, which sought to avoid paying creditors the default rate of interest. Now, in that case, they impaired the class. The class voted no. They went to a crammed-down hearing, and the court said it's not fair and equitable. You don't take solvent. We don't have a bankruptcy system so that solvent entities can take money from creditors and give it to their equity holders. So the rule that my colleague advocates here would leave, ironically, an unimpaired class of creditors in a worse position than an impaired class. There's nothing in their brief that explains why that could ever be so. I know that my colleague, Mr. Dunn, will have time to address some of the other issues in the case, but I do want to take just a moment to say two things. First, with regard to this double-counting issue, the formula here, which is designed to pay you nothing in an environment where you're not harmed by prepayment and pay you something where you are harmed, the formula depends that you actually have the money as of the relevant date of calculation. And so that's why Judge Isger was correct to say that there's a distinction between making you whole as of that date, here the petition date, and compensating you for the 532 days that he referred to. And the last point I did want to touch on is just this notion of windfall. It's in the first line of their brief that this is a windfall, it's a huge amount of money. We've never asked for a dollar more than is owed to us under our contracts. If this is a windfall, it would be a windfall on a reversal that they're looking for here. If Your Honors have more questions, I'd be happy to take them or else yield to my colleague. Let me just ask you in doubt, didn't the Sixth Circuit remand to the district court to consider the 528, 520 issue, 502 issue? No, I don't think so. What was the remand for? I know there were issues in the case. I'll try to take a quick look. I don't think there was any remand, Your Honor, on the question of the allowability of interest at the default rate. I know there were other issues in the case that had to be considered on remand. I just don't recall at the moment what they were. Thank you. Thank you. We can give additional time. It says 10 up here, and I know I've given some additional time to the appellant. That's fine. Good morning, Your Honors. I may please the Court. Dennis Dunn from Milbank Tweed on behalf of the Apoees, the OPCO Ad Hoc Committee. Let me start by just setting out what I think is one fundamental truth that we shouldn't lose sight of, which is that the appellants are asking this Court to be the first court since the abrogation of Section 1124.3 to deny an unimpaired creditor post-petition interest at the contract rate. We cite numerous cases, such as the Ninth Circuit case in Pacifica, that concluded that unimpairment demanded payment of post-petition interest, and it was at the contract rate at that case. There's not a case that shows you can do what they seek to do today. Why? Because in essence, that's precisely what 1124.3 allowed. They talked in terms of paying allowed claims in full in cash. Once Congress used the term allowed claim, that runs it right through 502B. And if you then reduce it by whatever the cap is under 502B, pay it in full in cash, like they're trying to do here, it is unimpairment. When the Banks v. Court in New Jersey did that in New Valley, I've actually never seen Congress act so quickly with respect to an independent bankruptcy level case. They found the unfairness justifying complete abrogation of that statute. Now, for the first time, appellants are trying to get this Court to interpret 1124.1 to equate to 1124.3 with respect to the same fact pattern that justified the reversal or the abrogation of 1124.3 by Congress. And even the Third Circuit in PPI said we wouldn't have touched that. If this was dealing with post-petition interest at the contract rate, Congress couldn't have spoken more clearly. Instead, they found there was space between interest and a landlord-capped damage claim under 502B.6, which is not before the Court at all. Let me pick up on a colloquy that Judge Oldham had with my co-counsel. I think that there's further evidence for this in Section 1126, where 1126A talks in terms of allowed claims voting. Yes, when they're impaired and voting, you're, of course, run through Section 502B. 1126F talks about unimpaired classes that don't vote at all, and the word allowed isn't there. They're conclusively presumed to have accepted in 1126F. But doesn't that just mean how they're proposed to have voted? I mean, they're still voting. They're just presumed to have voted in favor. Correct. But they should have said if these terms are identical, they should have said a holder of an allowed claim in a class that is unimpaired is deemed to accept. They said a holder of a claim, not a allowed claim. And I'll just call the Court's attention to the Supreme Court case in Travelers from 2007, which said, quote, when the code uses the word claim, unquote, it refers, quote, to a right to payment recognized under State law. So in essence, the best textual reading of 1124.1 is that the plan has to give us everything due and owing under State law because it uses the word claim. And picking up on another point that Judge Oldham made, there's actually a case, it's Kittresser v. CIT 177BR458 from the District Court of New York in 1995 that dealt with the notion of whether 502B was a floating impairment, a statutory reduction in claims. And in that case, there was a Chapter 11 case that was pending for months and then dismissed. The secured creditor foreclosed on his collateral. The borrower said, wait a minute, I spent six months or so in bankruptcy, and Section 502B2, you know, deprives you for of interest to the extent you're undersecured. The District Court made short work of that and said no, because unless and until the plan effectuates it, it is of no moment. And the plan, as Your Honor said, could decide to do a lot of things. You could exempt from the discharge, as Judge Isger indicated, or you could pay additional amounts. Is the District Court case the best case that the appellees have for this proposition of the code impairment versus plan impairment? Because the way I read the briefs, there's PPI, there's Collier's, and there is an avalanche of other cases that stand for the proposition that there is a distinction between plan impairment and code impairment. And the way I've not read the case that you just described, I don't know if it's cited in the briefs, but to the extent that it is and it's before us, that sounds like you're saying that's contrary to the distinction drawn by the Third Circuit? I'd say, A, what the Third Circuit itself said, recognized as dicta, they would come out differently had we been dealing with post-sufficient interest because Congress couldn't have spoken more clearly. I think this Court doesn't need to decide statutory impairment versus plan impairment, but if you're asking me, I think that the straight-up application of 502B to unimpaired claims didn't survive the deletion of Section 1124.3. But there's a number of cases, really to your point, that don't deal with 502B. The American Solar King case deals with 510B, which is a treatment section. There's a number of other cases that deal with the treatment of tax claims under Section 1129A itself. Again, not 529, and doesn't get to the distinction between allowed claims and claims that we're talking about now. That's okay, you have your claim. What does the statute say in terms of the treatment? I can stretch out my tax claims for five years and pay them in equal installments. Does that render them impaired? That doesn't get to the point we're talking about, and I submit that most of the cases that are cited deal with 510B and the 1129A tax and not this direct tension between 502B and 1124.1, which, by the way, is really highlighted by the landlord cases. And I think that Judge Davis was correct that PPI wasn't a solvent case. The money ran out in a creditor class for the affiliates. So that was correct. I also want to point out that if appellants believed their position on Section 502B, they should have provided no interest. Instead, they say on page 20 of their reply brief that they must provide post-petition interest on our claims in order to unimpair us. That's a kind of stunning comment, at least logically. And then they say that that rate is at the federal judgment rate. And then they go and look some way to bootstrap Section 726A5, which applies only in Chapter 7 cases and is referenced in Chapter 11 cases only in the best interest of creditors test, Section 1129A7, which only on its face deals with impaired creditors. So you can never get there on that. But their point is it was a bridge too far to actually say you get zero interest. And they're looking for this court to make new law on that basis, because as I've said, there's been no court that has done anything but provide post-petition interest at the contract rate for unimpaired creditors since the abrogation. Do you say that the 502 exemptions apply in solvent bankruptcy cases, solvent debtor? That's a big question. Let me focus on the interest, not the facts at bar, because there's a lot of subsections in 502B. And this is where if you have a solvent debtor, and let's assume we were impaired and we had no dispute about whether 502B was applying to impaired creditors. There are two ways for post-petition interest to be paid in a Chapter 11 case on impaired claims, notwithstanding the prohibition in 502B2. One is 726A5, the best interest of creditors test, which we've talked about and doesn't apply to unimpaired. The other is the fair and equitable test under Section 1129B. So if I am a class of unsecured bondholders, you don't get post-petition interest if you're impaired, but old stockholders are getting some distribution because it's a solvent case. The plan proposes not to give me unmatured interest. I vote that plan down. If I accepted it, we never get to this. If I vote that plan down, we get to the cram-down sections of the Bankruptcy Code which say that the plan has to be fair and equitable. And there is a score of cases both under the Code and under the former Bankruptcy Act that have said for a plan to be fair and equitable between a creditor class and old equity, the creditors need to receive everything due and owing under their contract. Why? Because it's not equitable. The stockholders voted in the Board of Directors. The Board of Directors were their agents who went to the market, negotiated, and executed that bond document that provided for that interest or that make-hole or that charge or that fee. And here, ironically, you heard Mr. Clement basically say we never have to get to 1129B, which is true because they didn't impair us. But what he's also saying is he wants the court to get to a result where if we were unimpaired, we could have a worse result. The federal judgment rate is their supposition. Then if they impaired us and I voted the plan down and I had access to that line of cases with respect to fair and equitable. Let me talk quickly about the make-hole. We heard Mr. Clement talk about the make-hole being interest. I'll remind the court what I think we all know is that our rights are determined by State law and we should look at State law when interpreting the make-hole. And we cite both New York State case as well as Texas for the proposition that a make-hole is not interest. It's liquidated damages for the termination of the contract, and that is the Feldman case and the Lyons case in New York State court. And this court should just adopt that. But if you thought, well, let me look at the reasoning, you can look at the Fifth Circuit case in Atchee Holdings, 342 Federal Appendix 943, where that was dealing with the Texas usury challenge to a make-hole and basically said usury doesn't apply at all. Why? The make-hole is not interest. If the make-hole was interest, as Mr. Clement said, usury laws and those other interest-related statutes would apply. Do you have any argument that it's not the economic equivalent of unmatured interest? Or you can see that point but think there's a different legal standard that we should apply to 502? I think it's a – well, there's two points here. I actually think it's compensation that was negotiated at the time of the contract for the breakage of the contract. They could have used a bunch of inputs, right? But they happened to use T plus 50 as the discount rate off the interest stream. The second point that you made about the economic equivalent is that's – that is when Judge Isger down below was asking the Debtors' Council, are you sure you want to unpair them? Because if you unpair them, I can kind of get into the bankruptcy clauses. I can get into whether or not, you know, this is something other than State law has determined it to be. I still think we would win if we did that, but the foray is precluded by the fact that they unimpaired us. And as the Supreme Court said, you have to give us what our State law right to payment was in that circumstance. But not your bankruptcy code right to payment. This is the thing I'm struggling with with this concept between claims and allowed claims. So you want us to say that the word claim in 1124.1 means the broad definition of claim that's in Section 101 of the Bankruptcy Code. It's just what we're entitled to. It's everything that we say. We come forward with our proof of claim. And in determining that, we look outside of just the contract, right? Like as Judge Isger did, we have to look at, for example, New York State law, right, and whether this is – you know, it's disallowed under New York law. But we don't look to the bankruptcy code? Let me answer that. I think – I was trying to make it easier for the panel, which is I think that because they unimpaired us, you don't have to do it. But let's assume your question supposes that you did move on to that analysis, we still win. I mean, the Butner case in the Supreme Court says even in connection with impaired claims, you look to the state law characterization of those rights. And they're asking you again to be the first court to kind of overrule that line of New York and Texas and Fifth Circuit and Second Circuit cases that have held the make-all not to be interest for these purposes. One last point, if I may, the two separate breaches. Let's remember what would have happened. They're not to – it's not double counting because we have separate breaches. If they had performed the contract as they should have, and Judge Isker makes a point of this saying that they were a solvent debtor, they could have paid off the make-all and the principal. Had they, we would have gotten the make-all quantum and the principal quantum and had that year to redeploy it in the market and receive the return. What they're saying now is you don't get the return, the interest, on that amount because we kept it. We breached a second time, and the consequence of that breach is that you continue to run interest on it, but we don't want to pay that interest because we think it's somehow double counting, and we want you to be a forced lender for that period of time instead of getting the money back and reinvesting it, which is why, as we pointed out, even if we didn't have the contract rate in the document, New York CPLR would have provided a prejudgment interest rate of 9%, which is actually higher than what our contractual rate was here. And unless the panel has any other questions. Thank you, Mr. Davis. Thank you. Clement. Thank you, Your Honors. Just a few points of rebuttal. First, I promised Judge Davis a case with a solvent debtor. There's an unambiguous case, which we cite at page 21 of our opening brief, note 4. It's called In Re Quorum. But I would also emphasize that as we read PPI, it is actually a solvent debtor case. It doesn't say it in those terms. But if you look at footnote 5 of that opinion and you look at the amount of the claim, I actually think PPI was a situation very much like this, where maybe when bankruptcy started, they thought the value of their own asset was less than the value of this claim, but footnote 5 suggests that as the bankruptcy went on, their only asset, the stock, was worth more than the value of the claim. The most important thing, though, I think, is we can actually debate whether PPI is a solvent debtor case because PPI doesn't mention it one way or another because nothing in its analysis I think properly turns on that. Another question you asked, Judge Davis, was whether or not the other side could have sought dismissal in the district court, in the bankruptcy court, and got the benefit of their State law rights back without the effect of 502B. The answer is they absolutely could have asked for it. I don't think they did, not because they're not litigious, but because they would have no basis to ask for that. There's no question here, and I don't think any real dispute, that when we went into bankruptcy, that was a good-faith effort and we were not taking advantage of 502B or anything other untoward. We were there because the price of natural gas made it untenable, and, frankly, these creditors were forcing us into bankruptcy by demanding immediate payments and questioning whether we had sufficient capital. So we were in bankruptcy in complete good faith and were entitled to those provisions. You asked also, my friends on the other side, whether they could make an argument that 502B does not apply to solvent debtors. They went on to address a different issue, but they didn't offer you a theory of that because there's nothing in the text of 502B that suggests it applies differently to solvent or insolvent debtors, and I would state, as I did in earlier, that there's nothing in 1124 sub 1 that suggests it applies differently in a solvent versus an insolvent debtor context. I want to make a point about double counting and then maybe talk about sort of the issue of whether there's some inconsistency with disallowing interest as a claim, but nonetheless recognizing that they are entitled to some amount of post-petition interest. But before I say that, on double counting, there's a suggestion that somehow under the contract they should have gotten this payment earlier and they didn't, and I want to be clear that our position is if they are entitled to a make-all payment, which we don't think they are, but if they are, we don't take issue with the fact that they're entitled to post-petition interest on the make-all amount for the 532 days of bankruptcy. So they can't sort of say, well, it's not double counting because we should have gotten the make-all payment earlier. And the reason there is double counting here and there's just no way of getting around it is that the make-all payment, because it's triggered by the moment they enter bankruptcy, does give them the equivalent of interest for that period until the very end of the note, and then the post-petition interest on the unpaid principle, not on the make-all amount, but on the unpaid principle, is nothing but interest for the first 532 days. So they were compensated for the interest they didn't get, and then they got the interest. That's where the double counting comes from. Now, my friend on the other side would like you to believe that this is New Valley, the case that Congress responded to in repealing 1124 sub 3 all over again. It is not. In New Valley, the plan there gave zero post-petition interest whatsoever to the holders of the allowed claims who were paid the cash value of those claims on the day of the plan's effective date. Zero post-petition interest. It is precisely because Congress responded to that and repealed it that we are not trying to get New Valley all over again. We say we will pay them post-petition interest. And there's really no dispute between the parties here that we need to pay post-petition interest in order to leave their claims unimpaired. The only question is what's the rate. Now, there's nothing inconsistent in our position because there is a difference between interest as a claim, which is what you cannot have for unmatured interest and the like under 502B, but you also have the different concept, which is interest on a claim, which you are allowed, and the code isn't very specific about what the right rate is for that post-petition interest, but I do think it's important to focus on the question, which is the question is what is the minimum rate that we can provide them that will leave their claims unimpaired? And although it takes work, we think the code does provide an answer to that. The code basically says in those situations where we're going to provide post-petition interest if there's enough money in the estate, we're going to do that based on the legal rate. And although it doesn't match up perfectly with the text of this case, I think if the question is what's the amount we need to pay to leave them unimpaired, the answer the code provides is the same amount that you need to provide to provide an appropriate amount of post-petition interest in the Chapter 7 context or the case of impaired creditors, and that is the legal rate, and we think that the Ninth Circuit has the better of the analysis that the legal rate means the Federal judgment rate. Thank you, Your Honors. Thank you. Thank you all for your briefs in this case, your extensive briefing, which was very, very high quality and very insightful, and we certainly appreciate your remarks here today and your answers to the questions that the panel has posed. We'll take the case under advisement and render a decision in due course, and court will be adjourned.